**S & S SCREW MACHINE COMPANY, Plaintiff,**

v.

**COSA CORPORATION and Gildemeister, AG, Defendants.**

**COSA CORPORATION, Third-Party Plaintiff,**

v.

**LITTON INDUSTRIES, INC. (NEW BRITAIN MACHINE DIVISION), Third-Party Defendant.**

No. 2–85–0036.

United States District Court, M.D. Tennessee, Northeastern Division.

Oct. 17, 1986.

---

Lin S. Howard, Jeffrey A. Greene, Harwell Barr Martin & Stegall, Nashville, Tenn., for plaintiff.

Sive, Paget & Riesel, P.C., Eric Bregman, New York City, John P. Branham, Eugene J. Honea, Howell Fisher Branham & North, Nashville, Tenn., Thomas P. Kanaday, Jr., Farris, Warfield & Kanaday, Nashville, Tenn., Stephen K. Rush, for Cosa Corp.

Ward DeWitt, Jr., Andree K. Blumstein, Trabue, Sturdivant & DeWitt, Nashville, Tenn., for Gildemeister.

## MEMORANDUM

WISEMAN, Chief Judge.

### I. *Introduction*

This is a civil action brought pursuant to diversity jurisdiction, 28 U.S.C. § 1332. Plaintiff S & S Screw Machine Co. (hereinafter S & S) claims breach of warranties and intentional misrepresentations by defendants Cosa Corp. (Cosa) and Gildemeister Aktiengesellschaft (Gildemeister). In essence, S & S claims that it failed to receive what it bargained for on the purchase of some $338,443.00 worth of industrial equipment manufactured by Gildemeister and sold to S & S by Cosa. Defendant Cosa, while denying liability to S & S, has crossclaimed for recovery from Gildemeister in the event Cosa is held liable to S & S.[1]

Gildemeister, which is incorporated under the laws of the Federal Republic of Germany and maintains principal offices there, has neither offices nor permanent employees in the United States. Pursuant to rules 33 and 34 of the Federal Rules of Civil Procedure, S & S has propounded to Gildemeister some 21 interrogatories and 17 requests for production of documents.[2] Pending are two motions by Gildemeister that the Court (1) dismiss this action against it on the grounds that the court lacks *in personam* jurisdiction, and (2) frame a rule 26(c) protective order directing that the instant discovery and all discovery "relating to foreign nationals and entities in this case" conform to the proce-

---

1. Cosa's contingent crossclaims against Gildemeister allege negligence, misrepresentations, and breach of warranties and of contractual obligations. Cosa also has a third-party complaint against Litton Industries, Inc. (New Britain Division), its successor as Gildemeister's "exclusive agent" in the United States, to the extent Cosa should be held liable to S & S for failure to perform its service obligations.

2. The interrogatories and requests are reprinted in an Appendix to this Memorandum.

dures specified in the Hague Evidence Convention.[3]

For the reasons stated below, the Court holds that:

(1) Gildemeister is subject to in *personam* jurisdiction within the limits of Fourteenth Amendment due process as permitted by the Tennessee long-arm statute; and

(2) S & S, as a first resort, must direct its interrogatories and requests for production pursuant to the terms of the Hague Evidence Convention.

## II. *In Personam Jurisdiction*

### A. *Factual Background*

The record before this Court[4] indicates the following: In 1982, management of S & S, a Cookeville, Tennessee company, decided to obtain automated production equipment of the type manufactured by Gildemeister and sold by Cosa.[5] In late 1982, S & S officials attended a trade fair in Chicago at which Gildemeister products were demonstrated by representatives of Gildemeister and Cosa. Thereafter, upon invitation of Gildemeister and Cosa, S & S representatives visited the Gildemeister factory in Germany. Gildemeister partially subsidized this trip. Gildemeister products were sold to S & S by Cosa in 1983 and 1984. During 1982, 1983, and 1984, Gildemeister representatives made visits to the S & S offices in Tennessee. The parties dispute the exact nature of representations made or services delivered by Gildemeister on these various occasions.

Between 1974 and 1984, Gildemeister and Cosa were parties to an "Exclusive Agency Agreement." The agreement granted to Cosa exclusive rights to sell certain Gildemeister products and to "secure and enlarge the market share" for Gildemeister. Although the agreement recited that Cosa would act as an "independent agent," buying and reselling "in his own name and on his own account," the agreement also called for close cooperation between the two companies, including:

(1) sharing of marketing data;

(2) a coordinated approach to national advertising;

(3) "the absolute necessity" for Cosa to "insure information on and discussion of sales prices" with Gildemeister;

(4) sharing the cost of participation in trade shows;

(5) reimbursement by Gildemeister for certain services performed by Cosa under warranty;

(6) employment by Cosa of three specified Gildemeister sales and service personnel;

(7) a provision that, upon termination of the agreement, Gildemeister "shall be prepared to come to an understanding with (Cosa) as to accepting return of all products" unsold.

Exclusive Agency Agreement, Exhibit A to Affidavit of William Jacobson, Cosa sales manager.

Gildemeister has submitted an affidavit of one of its board members asserting that the firm's only relationship with Cosa is contractual. Gildemeister asserts that it solicits no business in Tennessee; targets no advertising here; and has no employees, agents, representatives, offices, corporate records, or contracts here. Gildemeister

---

**3.** Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters, *opened for signature* March 18, 1970, 23 U.S.T. 2555, T.I.A.S. No. 7444 (*entered into force* between the United States and the Federal Republic of Germany on June 26, 1979), *reprinted* at 28 U.S.C. § 1781 note (West Supp.1986) (hereinafter Hague Evidence Convention or the Convention).

**4.** In a previous Memorandum opinion on October 4, 1985, this Court ordered that S & S serve Gildemeister in accordance with the terms of the Hague Convention of the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters, 20 U.S.T. 361, T.I.A.S. No. 6638, 658 U.N.T.S. 163. In that Memorandum, the Court noted some conflicts in the factual assertions made in affidavits submitted by the parties and elected to withhold ruling on the jurisdictional issue at that time. Upon further review of the record, the Court determines that the issue is ripe for decision; the factual summary immediately hereinafter is based upon admitted or uncontradicted assertions in the record.

**5.** Cosa is a New York corporation with principal offices in New Jersey.

further asserts that it "is not qualified to do business in Tennessee, does not do business in Tennessee, and does not sell products or perform services in Tennessee." Affidavit of Hermann Reinold. Another Gildemeister affidavit asserts that the German firm "was not asked to and did not deliver parts and/or services to S & S." Affidavit of Klaus Wenker, regional sales manager.

Despite these general statements, Gildemeister has not disavowed the specific record assertions of both S & S and Cosa that named Gildemeister employees visited S & S on several occasions, nor the assertions that Gildemeister invited and partially paid for the S & S trip to West Germany. Juxtaposing the general nature of Gildemeister's denials with the specific nature of the assertions made by S & S and Cosa, the Court concludes that these assertions of Gildemeister's activities are more than naked allegations; what conflict exists between the parties' versions of events is more one of legal interpretation than of factual disparity.

### B. *Due Process Limits*

### 1. *Procedural Standards*

In determining whether a defendant is subject to personal jurisdiction, the stage of the litigation affects the standard but not the burden of proof. Throughout, plaintiff bears the burden of persuasion. *Welsh v. Gibbs*, 631 F.2d 436, 438 (6th Cir.1980), *cert. denied*, 450 U.S. 981, 101 S.Ct. 1517, 67 L.Ed.2d 816 (1981).

Fed.R.Civ.P. 12(d) enables defendant to raise a jurisdictional challenge and a court to rule on the motion before a trial on the merits. A district court may decide [6] whether to rule on the jurisdictional issue upon a full trial record, after an evidentiary hearing, or merely on the basis of a written record. At trial on the merits, plaintiff ultimately must prove facts that establish jurisdiction by a preponderance of the evidence. The same standard holds when plaintiff is put to his proof at a full evidentiary hearing. *Welsh v. Gibbs*, 631 F.2d at 438–39; *Data Disc, Inc. v. Systems Technology Associates, Inc.*, 557 F.2d 1280, 1284–86 (9th Cir.1977). When a court seeks to decide the issue on the basis of affidavits alone, however, plaintiff need only make a prima facie case of jurisdiction. To survive a motion to dismiss, thus, plaintiff need only "demonstrate facts which support a finding of jurisdiction." *Welsh v. Gibbs*, 631 F.2d at 438 (quoting *Data Disc, Inc.*, 557 F.2d at 1285).

In a diversity case, a federal court's in personam jurisdictional reach is determined by the law of the state in which the court is located. *Pickens v. Hess*, 573 F.2d 380, 385 (6th Cir.1978). When a state's long-arm statute has been interpreted by its courts to be as broad as the limits of due process allow, the issue of how far the forum state intends to reach merges into the inquiry of whether the jurisdiction sought comports with the requirements of due process. *First National Bank of Louisville v. J.W. Brewer Tire Co.*, 680 F.2d 1123 (6th Cir.1982). The Tennessee Supreme Court has said that its long-arm statute,[7] Tenn.Code Ann. § 20–2–214, ex-

---

**6.** "As there is no statutory direction for procedure upon an issue of jurisdiction, the mode of its determination is left to the trial court." *Gibbs v. Buck*, 307 U.S. 66, 71–72, 59 S.Ct. 725, 728–29, 83 L.Ed. 1111 (1939).

**7.** The statute provides in pertinent part:
 (a) ... [N]onresidents of Tennessee ... are subject to the jurisdiction of the courts of this state as to any action or claim for relief arising from:
 (1) The transaction of any business within the state;
 (2) Any tortious act or omission within this state;

 . . . . .
 (5) Entering into a contract for services to be rendered or for materials to be furnished in this state;
 (6) any basis not inconsistent with the constitution of this state or of the United States.

 . . . . .

 (c) Any such person shall be deemed to have submitted to the jurisdiction of this state who acts in the manner above described through an agent or personal representative.
Tenn.Code Ann. § 20–2–214.

tends "to the full limit allowed by due process." *Masada Investment Corp. v. Allen,* 697 S.W.2d 332 (Tenn.1985).

In *Masada, supra,* the Tennessee Supreme Court analyzed the limits of due process in light of two recent leading cases of the Supreme Court: *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985); and *World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980). The *Masada* court also implied that the three-pronged approach used by the Sixth Circuit in *Southern Machine Co. v. Mohasco Industries, Inc.,* 401 F.2d 374, 381 (6th Cir.1968) was "now too restrictive." The *Masada* court appeared also to base its analysis of minimum contacts on a five-factor test that was utilized by the Tennessee Court of Appeals in *Shelby Mutual Insurance Co. v. Moore,* 645 S.W.2d 242, 245 (Tenn.App.1981) and that is ultimately traceable[8] to an opinion by then-Judge Blackmun in *Aftanase v. Economy Baler Co.,* 343 F.2d 187, 195–97 (8th Cir.1965).

The square holding of *Masada,* however, was that legislative passage in 1972 of Tenn.Code Ann. § 20–2–214(a)(6) "expanded the jurisdiction of Tennessee courts to the full limit allowed by due process." 697 S.W.2d at 334. Determining the full reach of jurisdiction consistent with due process notions of fundamental fairness, this Court observes, necessitates weighing the facts of each case and precludes the use of "clear-cut jurisdictional rules" and "talismanic jurisdictional formulas." *Burger King,* 471 U.S. at 486 and n. 29, 105 S.Ct. 2174, 2189 and n. 29, 85 L.Ed.2d at 549 and n. 29. To the extent that a formula might result in a jurisdictional reach less extensive[9] than that permitted by the due process clause, its use is inconsistent with the square holding of the Tennessee Supreme Court. To the extent that a formula might produce a jurisdictional reach greater than that permitted by *Burger King* and other modern opinions by the Supreme Court, its use would offend the due process clause. In short, the use

---

**8.** The *Aftanase* test, which apparently is still utilized in the Eighth Circuit, culled features of five preceding Supreme Court cases beginning with *International Shoe Co. v. Washington,* 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945) and ending with *Hanson v. Denckla,* 357 U.S. 235, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958). The five factors formulated in *Aftanase* include three "primary" factors—the quantity of contacts, nature and quality of those contacts, and source and connection of the cause of action with those contacts—and two other factors—interest of the forum state and convenience.

The *Mohasco* test requires that:
First, the defendant must purposefully avail himself of the privilege of acting in the forum state or causing a consequence in the forum state. Second, the cause of action must arise from the defendant's activities there. Finally, the acts of the defendant must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable.
*Mohasco,* 401 F.2d at 381. The three requirements were distilled from *Hanson v. Denckla, supra,* and *McGee v. International Life Insurance Co,* 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957).

**9.** Any implication that jurisdictional reach under the *Mohasco* three-part test is less than coextensive with the limits of due process is erroneous. *Mohasco* was designed to circumscribe the

limits of in personam jurisdiction over an out-of-state defendant based on a single act. *Mohasco,* 401 F.2d at 381. The *Mohasco* court devised it after concluding that the Tennessee long-arm statute at issue reached "as far as the Constitution will permit." *Id.* at 377. Although subsection (a)(6) of the Tennessee long-arm statute was not added until four years after *Mohasco,* the Sixth Circuit subsequently has reaffirmed its application to long-arm statutes of Tennessee and other states with similarly broad authorizing clauses. *See, e.g., Chattanooga Corp. v. Klingler,* 704 F.2d 903 (6th Cir.1983); *First National Bank of Louisville & Brewer Tire Co.,* 680 F.2d 1123, 1127 (6th Cir.1982) (Kentucky law).

The only limitation upon the *Mohasco* test can be that, by its terms, it was designed to apply to the "single act" situation and therefore is applicable only in a *specific* jurisdiction case, i.e., "a suit arising out of or related to the defendant's contacts with the forum." *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 414 n. 8, 104 S.Ct. 1868, 1872 n. 8, 80 L.Ed.2d 404 (1984). The test would not be applicable to *general* jurisdiction cases, i.e., those *"not* arising out of or related to the defendant's contacts with the forum." *Id.* at 414 n. 9, 104 S.Ct. at 1872 n. 9 (emphasis added). *See generally* von Mehren & Trautman, *Jurisdiction to Adjudicate: A Suggested Analysis,* 79 Harv.L.Rev. 1121, 1136–64 (1966).

of either formula in this case is unnecessary and possibly confusing; this Court declines to use them.[10]

## 2. *Due Process and Commercial Activity*

The modern approach [11] to in personam jurisdiction, departing from earlier rigid notions of judicial power and territoriality, is based on the protection the due process clause provides to an individual's liberty interest in having "fair warning that a particular activity may subject [him] to the jurisdiction of a foreign sovereign." *Burger King,* 471 U.S. at 472, 105 S.Ct. at 2182, 85 L.Ed.2d at 540 (quoting *Shaffer v. Heitner,* 433 U.S. 186, 218, 97 S.Ct. 2569, 2587, 53 L.Ed.2d 683 (1977) (Stevens, J., concurring)). The Supreme Court has explained that this "fair warning" requirement "gives a degree of predictability to the legal system that allows potential defendants to structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit." [12] *World-Wide Volkswagen,* 444 U.S. at 297, 100 S.Ct. at 567. In a specific jurisdiction case, a defendant has "fair warning" if he has "purposefully directed" his activities at residents of the forum. *Keeton v. Hustler Magazine, Inc.,* 465 U.S. 770, 774, 801, 104 S.Ct. 1473, 1478, 79 L.Ed.2d 790 (1984).

In a business setting, the Supreme Court has called for a "highly realistic" approach that rejects "conceptualistic ... theories of the place of contracting or of performance. The focus, instead, should be upon the full context of the parties' activities. *Burger King,* 471 U.S. at 476, 105 S.Ct. at 2185, 85 L.Ed.2d at 545 (quoting *Hoopeston Canning Co. v. Cullen,* 318 U.S. 313, 317, 63

S.Ct. 602, 87 L.Ed.2d 777 (1943)). A single contract formed across state lines *by itself* is insufficient to establish minimum contacts. A single act, however, can establish a sufficient basis for personal jurisdiction if it creates a "substantial connection" with the forum state. *Burger King,* 471 U.S. at 474–77 & n. 18, 478–80, 105 S.Ct. at 2183–84 & n. 18, 2185–86, 85 L.Ed.2d at 542–43 & n. 18, 544–45.

■ In determining whether a commercial defendant has purposefully established minimum contacts within the forum, thus, courts should consider the following factors: "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing." *Id.* at 474–77, 105 S.Ct. at 2183–84, 85 L.Ed.2d at 542–43. Crucial to the inquiry is that the defendant's conduct and connection with the forum state be such that it should "reasonably anticipate being haled into court there." *World-Wide Volkswagen,* 444 U.S. at 297, 100 S.Ct. at 567.

■ Once it is decided that a defendant has established "minimum contacts" with the forum, *Burger King* directs that in "appropriate cases" a court may go on to evaluate other factors to decide whether assertion of personal jurisdiction comports with the "traditional conception of fair play and substantial justice" described in *International Shoe v. Washington,* 326 U.S. 310, 320, 66 S.Ct. 154, 160, 90 L.Ed. 95 (1945). Those other factors include the "burden on the defendant, the forum state's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the

---

**10.** The Sixth Circuit itself has eschewed "mechanical" application of the *Mohasco* three-part test. *Welsh v. Gibbs,* 631 F.2d at 438. Both the *Aftanase* and *Mohasco* criteria were attempts to distill into a paragraph the essence of the Supreme Court's holdings in the area of personal jurisdiction as of the time of their formulation; neither was intended to be a rigid formula.

**11.** While disavowing any mechanical approach, the *Burger King* Court outlined a two-step analysis: (1) Are there minimum contacts? (2) Does

the assertion of personal jurisdiction comport with "fair play and substantial justice" in light of other factors? *Burger King,* 471 U.S. at 476–77, 105 S.Ct. at 2184, 85 L.Ed.2d at 543 (1985).

**12.** For a review of the "private ordering" theory of jurisdiction into which many commentators place the Supreme court's recent approach, see Saposnick, *Federal Practice and Procedure: Personal Jurisdiction,* 1985 Ann.Surv.Am.L. 349.

608

most efficient resolution of controversies, and the shared interest of the several states in furthering fundamental substantive social policies." *Burger King*, 471 U.S. at ——, 105 S.Ct. at 2184, 85 L.Ed.2d at 543 (internal quotation marks omitted) (citing *World-Wide Volkswagen*, 444 U.S. at 292, 100 S.Ct. at 564).[13]

With these general principles in mind, this Court concludes that the assertion of personal jurisdiction in Tennessee over Gildemeister at this stage of the litigation does not offend due process. There are two alternative grounds for this holding: (1) direct actions taken by Gildemeister or its employees with knowledge that S & S was the ultimate purchaser; and (2) the indirect benefit Gildemeister received from the establishment of an interstate sales network by its exclusive United States agent, Cosa.

First, Gildemeister's direct actions satisfy the "purposeful availment" standard. Gildemeister representatives attended the Chicago trade fair. Gildemeister invited S & S representatives to come to Germany and partially paid for their travel. Gildemeister employees made sales presentations directly to S & S on that occasion. Gildemeister representatives visited S & S in Tennessee on several occasions over at least a two-year span. Gildemeister was in part financially responsible for warranty repairs for one year after purchase, and its employees provided some services. Cosa kept Gildemeister continuously apprised of its sales to S & S.

■ This record of awareness and direct participation by Gildemeister persuades the

Court that plaintiff has made out at least a prima facie case that Gildemeister *itself* engaged in actions that created a "substantial connection" with S & S in Tennessee. This is *not* simply a case, as Gildemeister has argued, in which "three machines manufactured by defendant found their way to Tennessee via New York and through the sales efforts of a third party, Cosa, to whom the machines had originally been sold." Gildemeister Memorandum in Support of Motion to Dismiss at 14. The affidavits and other materials in the record reflect that Gildemeister and Cosa cooperated to develop and expand the American market[14] over a period of ten years. Gildemeister obviously benefited financially from this arrangement. The sales of three machines to S & S came near the end of this period—not in a single deal, but rather in three related transactions over a 14-month period. Gildemeister employees engaged in sales presentations before the first sale, both in Germany and by telephone and personal visit(s) to Tennessee; following the sales they at least assisted in providing some service. An inference is warranted that Gildemeister invited, encouraged, and directly participated in these sales.

A review, thus, of the parties' negotiations and "actual course of dealing," *Burger King, supra*, leads the Court to conclude that there are facts sufficient to support a finding that Gildemeister "deliberately" and "purposefully" directed its activities toward sales of machines through Cosa to S & S, and thereby affected persons in Tennessee. *Keeton v. Hustler*

**13.** The *Burger King* Court also noted that, when minimum contacts are present, in order to defeat jurisdiction, a defendant must make a "compelling" case that litigation in the forum is "so gravely difficult and inconvenient" that it would be severely disadvantaged. Lesser considerations may be accommodated by adjustments in choice of law or transfer of venue. The Court also observed that, when these other considerations weigh in favor of the reasonableness of jurisdiction, a plaintiff may prevail upon "a lesser showing of minimum contacts than would otherwise be required." *Burger King*, 471 U.S. at ——, 105 S.Ct. at 2184–85, 85 L.Ed.2d at

543–44 (citing as examples *Keeton, supra, McGee v. International Life Insurance Co., supra*, and *Calder v. Jones*, 465 U.S. 783, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984).

**14.** Cosa sold about 250 Gildemeister machines in what appears to be a regional market including Missouri, Kentucky, Virginia, South Carolina, North Carolina, Louisiana, Arkansas, and Tennessee. S & S apparently is the only Tennessee customer. Affidavit of William Jacobson at 2.

*Magazine, Inc.*, 465 U.S. at 774, 781, 104 S.Ct. at 1478, 1481.

The Court thus rejects as inapplicable Gildemeister's reliance upon *World-Wide Volkswagen* for the proposition that its amenability to suit "does not travel with the chattel" it manufactures. Gildemeister is far more than a passive party whose only connection with the forum resulted from the unilateral activity of another. *Cf. World-Wide Volkswagen*, 444 U.S. at 296–97, 100 S.Ct. at 566–67; *Kulko v. California Superior Court*, 436 U.S. 84, 98 S.Ct. 1690, 56 L.Ed.2d 132 (1978); *Hanson v. Denckla, supra.*

Gildemeister's relationship to Cosa in the chain of distribution, coupled with its ongoing awareness of the sales by Cosa to S & S, clearly distinguishes it from the regional auto dealers in *World-Wide Volkswagen, supra,* who were haled into an Oklahoma court due to the "fortuitous circumstance that a single Audi automobile, sold in New York to New York residents, happened to suffer a accident while passing through Oklahoma." *World-Wide Volkswagen,* 444 U.S. at 295, 100 S.Ct. at 566. Gildemeister was in a position to devise, shape, and monitor its American distribution system by virtue of its exclusive agency contract with Cosa. Thus positioned,[15] Gildemeister can be said to have purposefully included Tennessee in the market it chose to expand and exploit for its products.

■ Secondly, even if Gildemeister had lacked awareness of, and direct participation in, Cosa's series of sales to S & S, the company's intention to exploit the American market, as executed by the agency contract with Cosa, suffices by itself to support an alternative ground for the exercise here of personal jurisdiction. Speaking in dictum not of the regional dealers but of the German manufacturer Audi and its national importer, Volkswagen of America, Inc., the *World-Wide Volkswagen* court said:

> "[I]f the sale of a product of a manufacturer or distributor ... is not simply an isolated occurrence, but arises from the efforts of the manufacturer or distributor to serve, directly or indirectly, the market for its product in other States, it is not unreasonable to subject it to suit in one of those States if its allegedly defective merchandise has there been the source of injury to its owner or others. The forum State does not exceed its powers under the Due Process Clause if it asserts personal jurisdiction over a corporation that delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum State.

444 U.S. at 297–98, 100 S.Ct. at 567. *Accord, Nelson by Carson v. Park Industries, Inc.,* 717 F.2d 1120 (7th Cir.1983), *cert. denied,* 465 U.S. 1024, 104 S.Ct. 1278, 79 L.Ed.2d 682 (1984).

A number of courts have employed reasoning closely analogous to the *World-Wide Volkswagen* dictum to hold manufacturers subject to *in personam* jurisdiction when they have delivered products into the "stream of commerce" with a reasonable expectation that they would reach the forum state.[16] The use of independent dis-

---

**15.** For a warranty case similarly approving personal jurisdiction over a manufacturer with analogous knowledge and contacts with an "ultimate purchaser," *see Henry Heide, Inc. v. WRH Products Co.,* 766 F.2d 105, 107–08 (3d Cir. 1985); *see also Nelson by Carson v. Park Industries, Inc.,* 717 F.2d 1120, 1126–27 (7th Cir.1983), *cert. denied,* 465 U.S. 1024, 104 S.Ct. 1278, 79 L.Ed.2d 682 (1984) (manufacturer awareness in products liability).

**16.** The *World-Wide Volkswagen* dictum is as close as the Supreme Court has come to endorsing the "stream of commerce" rationale. In *Burger King,* the Court observed that:

> [W]hen commercial activities are "carried on in behalf of" an out-of-state party those activities may sometimes be ascribed to the party, at least where he is a "primary participan[t]" in the enterprise and has acted purposefully in directing those activities.... [W]e need not resolve the permissible bounds of such attribution.

*Burger King,* 471 U.S. at 479 n. 22, 105 S.Ct. at 2186 n. 22, 85 L.Ed.2d at 545 n. 22 (citations omitted) (quoting *Calder v. Jones,* 465 U.S. at

tributors[17] has not affected this analysis; the cases typically have involved arrangements, as in the instant case, whereby the manufacturer authorized another entity to be its exclusive United States distributor. *See, e.g., Poyner v. Erma Werke GMBH,* 618 F.2d 1186, 1190–91 (6th Cir.), *cert. denied,* 449 U.S. 841, 101 S.Ct. 121, 66 L.Ed.2d 49 (1980); *Stabilisierungsfond Fur Wein v. Kaiser Stuhl Wine Distributors,* 647 F.2d 200 (D.C.Cir.1981); *Oswalt v. Scripto, Inc.,* 616 F.2d 191 (5th Cir.1980). In *DeJames v. Magnificence Carriers, Inc.,* the Third Circuit said:

> Under this theory, a manufacturer may be held amenable to process in a forum in which its products are sold, even if the products were sold indirectly through importers or distributors with independent sales and marketing schemes.... By increasing the distribution of its products through indirect sales within the forum, a manufacturer benefits legally from the protection provided by the laws of the forum state for its products, as well as economically from indirect sales to forum residents. Underlying the assumption of jurisdiction in these cases is the belief that the fairness requirements of due process do not extend so far as to permit a manufacturer to insulate itself from the reach of the forum state's long-arm rule by using an intermediary or by professing ignorance of the ultimate destination of its products.

*DeJames,* 654 F.2d 280, 285 (3d Cir.), *cert. denied,* 454 U.S. 1085, 102 S.Ct. 642, 70 L.Ed.2d 620 (1981).

Gildemeister's contractual relationship with Cosa established a means by which its products would "secure and enlarge" its american market share by sales in a number of states, including Tennessee. This arrangement, far from insulating Gildemeister, provides an alternative ground[18] for subjecting it to *in personam* jurisdiction.

■ An additional point in favor of jurisdiction is that plaintiff's claims against Gildemeister, whether they sound in contract or tort, allege intentional acts of fraud and breach of warranty. When the conduct at issue is intentional, a lesser showing of contacts may be required than in a claim of "mere untargeted negligence." *Calder v. Jones,* 465 U.S. at 789, 104 S.Ct. at 1487. An intentional actor is more likely to "reasonably anticipate being haled into court" to answer for his actions in a distant forum than a merely negligent actor. *See id.*

■ Finally, the Court finds unpersuasive Gildemeister's arguments that plaintiff's "only alleged contacts with Gildemeister were in Chicago and Germany" and that "any representations made to Gildemeister were made outside this forum." Even if this were so,[19] as the Supreme Court has said:

> Jurisdiction ... may not be avoided merely because the defendant did not *physically* enter the forum State. Although territorial presence frequently will enhance a potential defendant's affiliation with a State and reinforce the reasonable foreseeability of suit there, it is an inescapable fact of modern commercial life that a substantial amount of business is transacted solely by mail and wire communications across state lines, thus obviating the need for physical presence within a state in which business is conducted. So long as a commercial ac-

---

790, 104 S.Ct. at 1487; *International Shoe Co. v. Washington,* 326 U.S. at 320, 66 S.Ct. at 160).

**17.** *See, e.g., Hi Fi Corner, Inc. v. Inflight Cinema International, Inc.,* 505 F.Supp. 12 (M.D.Tenn. 1980); *Curtis Publishing Co. v. Golino,* 383 F.2d 586 (5th Cir.1967).

**18.** The Court does not find it necessary to consider whether application of Tenn.Code Ann. § 20–2–214(c) also would support jurisdiction over Gildemeister by characterization of Cosa as

an "agent or personal representative" of Gildemeister. *Cf. Chattanooga Corp. v. Klingler,* 704 F.2d 903, 907 (6th Cir.1983).

**19.** As noted *supra,* however, both Cosa and S & S assert that Gildemeister employees made visits to the S & S plant in Tennessee. At this stage of the litigation, this Court "consider[s] the pleadings and affidavits in the light most favorable to the plaintiff." *Welsh v. Gibbs,* 631 F.2d at 439.

tor's efforts are "purposefully directed" toward residents of another State, we have consistently rejected the notion that an absence of physical contacts can defeat personal jurisdiction there.

*Burger King,* 471 U.S. at 476, 105 S.Ct. at 2184, 85 L.Ed.2d at 543 (quoting *Keeton,* 465 U.S. at 774, 104 S.Ct. at 1478).

Having found that Gildemeister does have sufficient minimum contacts, the Court's inquiry then becomes: are there other factors present that would make exercise of jurisdiction here fail to comport with "fair play and substantial justice." *International Shoe,* 326 U.S. at 320, 66 S.Ct. at 160. Because Gildemeister's activities fairly can be characterized as purposeful, it must make a "compelling" case that these other considerations render jurisdiction "unreasonable." *Burger King,* 471 U.S. at 477, 105 S.Ct. at 2185, 85 L.Ed.2d at 544. Gildemeister has failed to carry this burden.

■ First, the Court is not persuaded that the burden of defending this case in Tennessee places Gildemeister at a "severe disadvantage" in comparison to its opponent(s). *Burger King,* 471 U.S. at 477, 105 S.Ct. at 2185, 85 L.Ed.2d at 544 (quoting *McGee v. International Life Insurance Co.,* 355 U.S. at 223, 78 S.Ct. at 201). Gildemeister has been deliberately exploiting the American market for at least ten years; it has had adequate notice that it might be subject to suit here. The company is represented by able counsel. Gildemeister has offered no argument why litigation in the Middle District of Tennessee is more inconvenient than any other United States District Court. If its argument is that S & S can sue Gildemeister only in the Federal Republic of Germany,[20] Gildemeister overreaches. *That* resolution would

place plaintiff S & S at a "serious disadvantage." *McGee, supra.*

■ The forum state here clearly has an interest in adjudicating this dispute. Tennessee has an expressed interest in seeing that its residents in interstate commercial transactions receive the benefit of their bargains. *Nicholstone Book Bindery, Inc. v. Chelsea House Publishers,* 621 S.W.2d 560 (Tenn.1981); *Chattanooga Corp. v. Klingler,* 704 F.2d at 907.

■ Finally, the Court rejects Gildemeister's argument that "the federalism considerations emphasized by the Supreme Court in World-Wide Volkswagen are especially important in this case" because defendant is the subject of a foreign sovereign and the indirect beneficiary of an international treaty. Memorandum in Support of Motion to Dismiss at 14. In recent decisions the Supreme Court has made clear that federalism concerns do not operate as an "independent restriction" upon state jurisdictional power. The restriction on state power, rather, "must be seen as ultimately a function of the individual liberty interest preserved by the Due Process Clause," which is the *only* source of the personal jurisdiction requirement and which "makes no mention of federalism concerns." *Insurance Corp. of Ireland v. Compagnie des Bauxites de Guinee,* 456 U.S. 694, 702, n. 10, 102 S.Ct. 2099, 2104, n. 10, 72 L.Ed.2d 492 (1982); *see Burger King,* 471 U.S. at 472 n. 13, 105 S.Ct. at 2182 n. 13, 85 L.Ed.2d at 540 n. 13. The fact that Gildemeister is the subject of a foreign sovereign thus little influences the jurisdictional issue; the fact that discovery will be processed as a first resort via the procedures of the Hague Evidence Conven-

---

**20.** In its brief, Gildemeister asserts that its contract with Cosa "contains a forum selection clause wherein the parties agreed to the resolution of any and all disputes under German law by a court of competent jurisdiction in Hanover, West Germany." Gildemeister states further that Cosa's cross-claim for indemnity "will have to be considered, at least in part, in light of" this contractual provision.

The Court recognizes the general acceptability, within limits, of freely bargained forum-selection clauses. *The Bremen v. Zapata Off-Shore Co.,* 407 U.S. 1, 92 S.Ct. 1907, 32 L.Ed.2d 513 (1972). Neither Cosa nor Gildemeister, however, so far has made the cited contractual provision a part of the record. In any event, the tail of any Cosa-Gildemeister agreement ought not be used to wag the dog of S & S's right to a forum in which it is not severely disadvantaged.

tion, *see infra*, makes the exercise of jurisdiction all the more reasonable.

### III. *Application of the Hague Evidence Convention*

#### A. *The Convention*

The Hague Evidence Convention grew out of an effort over several decades to promote cooperation in the development of uniform rules of private international law. In the words of its Rapporteur, the Convention represented a "substantial breakthrough" that was to provide "a bridge between civil law and common law practices for international judicial assistance in the taking of evidence abroad." Amram, *United States Ratification of the Hague Convention on the Taking of Evidence Abroad*, 67 Am.J. Int'l L. 104, 105, 107 (1973).

Before 1972, the procedures for gathering evidence abroad were governed only by domestic United States law, which called for the taking of discovery according to the procedures (1) of federal law; (2) of the relevant foreign law; or (3) as otherwise agreed to by the parties. *See* 28 U.S.C. § 1781; Fed.R.Civ.P. 28(b), 29. Great differences exist, however, between the American approach that places discovery largely in the hands of the parties with minimal court supervision before trial, and the traditional civil law approach that regards gathering of evidence as an exercise of judicial sovereignty entrusted largely to the court and often delayed until the trial itself. *See* Oxman, *The Choice Between Direct Discovery and Other Means of Ob-*

*taining Evidence Abroad: The Impact of the Hague Evidence Convention*, 37 U.Miami L.Rev. 733, 761–62 (1983); J. Merryman, *The Civil Law Tradition* 120–31 (1969). These differences led sometimes to impasses between U.S. courts and foreign governments, and frequently to the result that evidence secured abroad via unfamiliar procedures was either inadmissible or otherwise useless in the requesting court. The Hague Evidence Convention was designed to bridge these procedural obstacles by providing a means of securing evidence abroad that would be "tolerable" in the executing state while at the same time "utilizable" in the requesting forum. *Explanatory Report on the Convention on the Taking of Evidence Abroad in Civil or Commercial Matters*, S.Exec. A, 92d Cong., 2d Sess. VI (1972), reprinted in 12 Int'l Legal Materials 323, 327 (1973); *Report of the United States Delegation to Eleventh Session of Hague Conference on Private International Law*, 8 Int'l Legal Materials 785, 806 (1869); *see generally* Symposium, *Compelling Discovery in Transnational Litigation*, 16 N.Y.U.J. Int'l L. & Pol. 957 (1984).

The Convention was ratified by the United States in 1972 and, upon ratification by the Federal Republic of Germany in 1979, entered into force between the two countries. Gildemeister, as a corporation created under the laws of West Germany and headquartered there, has asked this Court to order pursuant to Fed.R.Civ.P. 26(c) that S & S conform all discovery requests [21] to the procedures [22] outlined by the Hague

---

**21.** Gildemeister's motion asks that all "discovery relating to foreign nationals and entities in this case" comply with the Convention. S & S's interrogatories and requests are directed to Gildemeister alone. According to the Rules, Gildemeister would be obliged to furnish such information "as is available to the party," rule 33(a), and which is in the "possession, custody or control of the party," rule 34(a).

**22.** The Letter of Request is the principal means of gathering evidence authorized by the Convention. Convention article 3 generally permits execution of a Letter of Request by the techniques of live deposition, interrogatory, and production of documents and of other tangible

items, as contemplated by rules 30, 33, and 34. This general permission is limited, however, by the other Convention provisions, principally by article 23. *See infra.*

The Convention also authorizes, subject to the approval of the executing government, two other means of evidence gathering: (1) the use of "diplomatic officers, consular agents and commissioners" to take, for example, live depositions; and (2) the use of "other" or "less restrictive" means than those specifically authorized in the Convention. Convention articles 16–22, 27. West Germany has assented in blanket form to neither of these options, which in cooperating countries may include allowing the parties' attorneys to operate as "commissioners," and thus

Convention. Fearing delay and citing the increased cost[23] and uncertainty of result in following the Convention procedures, S & S has urged that the Court deny issuance of a protective order and instead allow it to proceed in the usual manner under the Federal Rules of Civil Procedure. The principal cause for S & S's concern is the declaration of West Germany pursuant to Convention article 23 that it will not execute "Letters of Request issued for the purpose of obtaining pretrial discovery of documents as known in Common Law countries." 28 U.S.C. § 1781 note (West Supp. 1986).

### B. *Does The Convention Apply?*

 S & S has advanced two rationales for urging the Court to hold[24] that the Convention is inapplicable to the interroga-

tories and requests for production that it has submitted to Gildemeister.

First, it is urged, the Convention is inapplicable because the discovery is of such an unintrusive nature that it should be regarded as not "taking evidence abroad" at all. Rather, the Court should consider that the actions necessary to comply with discovery actually will take place in the United States, even if the information underlying those actions is located in West Germany.

The second proposed rationale, related to but more sweeping than the first, is that the Convention does not apply to parties subject to the jurisdiction of United States courts. Discovery of parties, the argument runs, is governed exclusively by the Federal Rules of Civil Procedure; the Convention applies only to discovery from nonparties.

Both rationales[25] underlay the reasoning of the Eighth Circuit in *In re Societe Nati-*

to question deponents directly. West Germany does, however, permit attorneys to attend depositions and engage in cross-examination of a witness "under the control of the requested judge." *Report on the Second Meeting of the Special Commission on the Operation of the Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters,* reprinted in 24 Int'l Legal Materials 1668, 1674 (1985) (hereinafter *1985 Report on the Hague Convention* ); *see generally* Shemanski, *Obtaining Evidence in the Federal Republic of Germany: The Impact of the Hague Evidence Convention on German-American Judicial Cooperation,* 17 Int'l Lawyer 465, 475 (1983).

**23.** The principal cost is that of translation into German. The Federal Republic of Germany has exercised the option permitted under Convention articles 4 and 33 of requiring that all Letters of Request be translated into the language of the country of execution. Declaration of the Federal Republic of Germany, 28 U.S.C. § 1781 note (West Supp.1986).

**24.** In interpreting the scope and meaning of a treaty, the Court is guided by the accepted principles of treaty interpretation, which begin with attention to the text and context, and then to its history, surrounding negotiations, and the practical construction adopted by the parties. *Air France v. Saks,* 470 U.S. 392, 397, 105 S.Ct. 1338, 1341, 84 L.Ed.2d 289, 295 (1985). Treaties also must be interpreted to effectuate their evident purposes. *Reed v. Wiser,* 555 F.2d 1079, 1088 (2d Cir.1977), *cert. denied,* 434 U.S. 922, 98 S.Ct. 399, 54 L.Ed.2d 279 (1977); *Factor v. Laubenheimer,* 290 U.S. 276, 293–94, 54 S.Ct. 191,

195–96, 78 L.Ed. 315 (1933). The construction of a treaty by the political department of the government, while not controlling upon a court, is nevertheless given weight. *Factor, supra,* at 295, 54 S.Ct. at 196.

**25.** Plaintiff has not pressed here an additional argument, accepted by some courts, that Convention article 27 supports a view that the Convention provides a mere "minimum measure of international cooperation" and was not intended to provide a fixed rule of conduct. *Volkswagenwerk Aktiengesellschaft v. Superior Court,* 123 Cal.App.3d 840, 859, 176 Cal.Rptr. 874, 886 (1981); *see also Graco, Inc. v. Kremlin, Inc.,* 101 F.R.D. 503, 520–21 (N.D.Ill.1984); *Lasky v. Continental Products Corp.,* 569 F.Supp. 1227, 1228 (E.D.Pa.1983). Article 27 states:

> The provisions of the present Convention shall not prevent a Contracting State from—
> (a) declaring that Letters of Request may be transmitted to its judicial authorities through channels other than those provided for in Article 2;
> (b) permitting, by internal law or practice, any act provided for in this Convention to be performed upon less restrictive conditions;
> (c) permitting, by internal law or practice, methods of taking evidence other than those provided for in this Convention.

This Court agrees with other authorities that a reading of the text of article 27, particularly of the phrase "internal practice," and of its context and legislative history, dictates the conclusion that its aim is only to authorize more liberal practices that the *requested* country chooses to utilize—not those a *requesting* country might prefer. *See Gebr. Eickhoff Maschinenfabrik und*

*onale Industrielle Aerospatiale,*[26] 782 F.2d 120 (8th Cir.1986), *cert. granted,* —— U.S. ——, 106 U.S. 2888, 90 L.Ed.2d 976 (1986); *see also In re Anschuetz & Co.,* 754 F.2d 602, 611–12 (5th Cir.1985). For the reasons stated below, this Court rejects each of these arguments and holds that the Convention does apply to the discovery at issue in this case.

■ This Court declines to adopt the geographic fiction that discovery responses under rules 33 and 34 require only the gathering or preparation of evidence, but not its production, on foreign soil. The Convention's central mechanism, the Letter of Request procedure, specifically contemplates document production. Convention article 3. Our own State Department has pointed out that this interpretation would render the Convention "unavailable and thus useless in the most common discovery contexts" and that "neither the United States nor foreign signatories to the Convention" have ever subscribed to this interpretation.[27] Brief for the United States and the Securities and Exchange Commission as Amici Curiae, *In re Societe Nationale,* (No. 85–1695) at 9–10 (hereinafter United States Amicus Brief). *Accord, Schroeder v. Lufthansa German Airlines,* 18 Av.Cas. (CCH) 17,222 (N.D.Ill.1983); *Pierburg GmbH & Co. v. Superior Court,* 137 Cal.App.3d 238, 186 Cal.Rptr. 876 (1982).

*Eisengieberei v. Starcher,* 328 S.E.2d 492, 499 n. 11 (W.Va.1985); *In re Anschuetz & Co.,* 754 F.2d 602, 608 & n. 11 (5th Cir.1985); *Philadelphia Gear Corp. v. American Pfauter Corp.,* 100 F.R.D. 58, 60 (E.D.Pa.1983); Amram, *United States Ratification of the Hague Convention on the Taking of Evidence Abroad,* 67 Am.J. Int'l L. 104, 107 (1973); Oxman, *supra,* at 758–60.

**26.** As an alternative to granting the protective order, Gildemeister asks this Court to defer decision on the order until the Supreme Court's disposition of *In re Societe Nationale.* Upon analysis of the issues and of the available Supreme Court briefs in that case, this Court believes (1) that a stay for that purpose would not promote judicial economy and (2) that the effect of its decision in the instant case will be consistent with any foreseeable outcome of *In re Societe Nationale.*

The Court finds equally little merit in S & S's second argument. The language and negotiating history of the Convention indicate that its drafters and signatories intended to reach evidence gathering from both parties and non-party "persons" to international civil lawsuits. *See* Brief for Petitioners, *In re Societe Nationale,* (No. 85–1695) at 17–20 (citing convention history).[28] It is true that, because United States courts lack sovereign power to compel compliance by non-parties abroad, the Convention perforce becomes the exclusive means to gather evidence from those persons. By contrast, a party's duty to produce evidence may be subject both to the Convention and to the Federal Rules of Civil Procedure. The mere entry onto the scene of the Federal Rules, however, does not make the Convention *inapplicable* to parties.

■ Both the preparation-production geographic fiction and the party-nonparty distinction[29] appear to embrace a notion that once a court acquires jurisdiction over a party, its power to enforce compliance with its orders is without limit. The power of the courts to enforce compliance with the Rules of Civil Procedure, however, obviously is limited by the due process clause. *Insurance Corp. of Ireland v. Compagnie des Bauxites de Guinea, supra,* 456 U.S. at 701–06, 102 S.Ct. at 2103–06; *Societe Internationale Pour Participations Industrielles v. Rogers,* 357 U.S. 197, 209, 78 S.Ct. 1087, 1094, 2 L.Ed.2d 1255 (1958).

**27.** Of course, the Convention would not apply to a request for documents to a foreign party when those documents arose from activities within, and already were located in the United States. *See International Society for Krishna Consciousness v. Lee,* 105 F.R.D. 435, 442 & n. 13 (S.D.N.Y.1984).

**28.** The position of the State Department is not that the Convention is inapplicable to parties, but that its application should be governed on a case-by-case basis by principles of international comity. United States Amicus Brief, *In re Societe Nationale,* (No. 85–1695) at 8.

**29.** While neither of these distinctions suffices to *nullify* application of the Convention, each may limit resort to the Convention that would otherwise be required purely by consideration of the principles of international comity, *infra.*

The precise issue before the Court now is whether (and if so, how) the operation of the Rules is modified by a treaty whose purpose is to safeguard the interests not of the litigants but of the signatory nations.

## C. *Harmonizing the Convention and the Rules*

■ As a self-executing treaty, the Convention has the force and effect of a federal statute. *Whitney v. Robertson,* 124 U.S. 190, 194, 8 S.Ct. 456, 31 L.Ed. 386 (1888). The federal rules likewise have the force and effect of federal statutes. *American Federation of Musicians v. Stein,* 213 F.2d 679 (6th Cir.), *cert. denied,* 348 U.S. 873, 75 S.Ct. 108, 99 L.Ed. 687 (1954); *Sibbach v. Wilson & Co.,* 312 U.S. 1, 615 S.Ct. 422, 85 L.Ed. 479 (1941). The Rules enabling acts provide that "laws in conflict with such rules shall be of no further force and effect after the rules take effect," 28 U.S.C. § 2072, and that the rules "shall be consistent with Acts of Congress." 28 U.S.C. § 2071. When two enactments relate to the same subject, a court should give effect to each, if that can be done "while preserving their sense and purpose" and "without violating the language of either." Repeals by implication are not favored. *Watt v. Alaska,* 451 U.S. 259, 266–67, 101 S.Ct. 1673, 1677–78, 68 L.Ed.2d 80 (1981); *Whitney v. Robertson,* 124 U.S. at 194, 8 S.Ct. at 458.

### 1. *Exclusive Mechanism*

■ With these principles of statutory reconciliation in mind, what effect does the Convention have on civil discovery of a foreign party? To begin with, the Court agrees with the three circuit courts and all other courts that have considered the issue that the Convention cannot be treated as the exclusive mechanism for securing discovery. *See, e.g., In re Societe Nationale,* 782 F.2d at 124; *Societe Nationale Industrielle Aerospatiale v. United States District Court,* 788 F.2d 1408 (9th Cir.

1986); *In re Anschuetz & Co.,* 754 F.2d 602, 606–15 & n. 7 (5th Cir.1985); *Gebr. Eickhoff Maschinenfabrik und Eisengieberei v. Starcher,* 328 S.E.2d at 497 (collecting cases).

Requiring exclusive use of the Convention for all foreign discovery would strip the federal courts of their jurisdictional power over litigants and contradict the assurances given by the United States delegate and Rapporteur of the Convention that:

> The Convention makes no major changes in U.S. procedure and requires no changes in U.S. legislation or rules.

Amram, *supra,* at 105.

### 2. *First Resort via Comity*

Many courts that have rejected the Convention as the exclusive mechanism for discovery abroad from foreign parties have proceeded nonetheless to require litigants to pursue Convention procedures as a first resort, either as an exercise of judicial restraint or of international comity. *See, e.g., Gebr. Eickhoff Maschinenfabrik und Eisengieberei v. Starcher,* 328 S.E.2d at 505–06; *Laker Airways Ltd. v. Pan American World Airways,* 103 F.R.D. 42 (D.D.C.1984); *contra, Societe Nationale, supra; Slauenwhite v. Bekum Maschinenfabriken, GMBH,* 104 F.R.D. 616, 619 (D.Mass.1985).

■ International comity is the recognition that one nation accords within its territory to the otherwise nonbinding laws of another nation, having due regard both for international cooperation and for the rights of those who seek the protection of the domestic laws. Comity is "neither a matter of absolute obligation, on the one hand, nor of mere courtesy and good will upon the other." *Hilton v. Guyot,* 159 U.S. 113, 163–64, 16 S.Ct. 139, 143, 40 L.Ed. 95 (1895).

In application, comity resists mechanical formulae; the absolute boundaries of the duties comity requires are "inherently uncertain."[30] *Laker Airways Ltd. v. Sabe-*

---

**30.** In *Hilton v. Guyot,* the Court quoted Mr. Justice Story for the observation:

> that comity is, and ever must be, uncertain; that it must necessarily depend on a variety of circumstances which cannot be reduced to

na, *Belgian World Airlines,* 731 F.2d 909, 937 (D.C.Cir.1984). In assessing the deference a United States court should display toward foreign laws limiting the scope of discovery requests, "what is required is careful balancing of the interests involved and a precise understanding of the facts and circumstances of the particular case." *United States v. First National City Bank,* 396 F.2d 897, 901 (2d Cir.1968).

Courts sometimes have looked to the Restatement (Second) of Foreign Relations Law of the United States (1965) for standards. Section 40 of the Restatement (Second) suggests five general factors helpful to resolve international conflicts of law.[31] A recent revision of the Restatement more specifically elaborates a series of criteria to guide resolution of conflicts arising from discovery disputes. The criteria are:

(1) the importance to the . . . litigation of the documents or other information requested;

(2) the degree of specificity of the request;

(3) whether the information originated in the United States;

(4) the availability of alternative means of securing the information; and

(5) the extent to which non-compliance with the request would undermine important interests of the United States, or compliance with the request would undermine important interests of the state where the information is located.

Restatement (Revised) of Foreign Relations Law of the United States § 437(1)(c) (Tent. Draft No. 7, 1986) (approved May 14, 1986).

Analyzing the facts and circumstances of this case in light of these general principles and guidelines, the Court concludes that a balancing of the interests involved requires a first resort by S & S to the Convention procedures. The Court recognizes that the documents and information at issue are essential to plaintiff's case; that the interrogatories and requests are narrowly drawn and, while the Court is not ruling in advance upon evidentiary issues, are predictably usable at trial; that as Gildemeister's counsel acknowledged at oral argument, the requests trigger no national policy or secrecy concerns of West Germany save its interest in judicial sovereignty. To the degree similar information is obtainable by S & S from Cosa or from other sources, the Court is confident that cost considerations alone will give S & S an incentive to eliminate duplicative inquiries.

Balanced against these considerations, however, are factors that tip the balance in favor of first resort to the Convention. This is purely private litigation; no national interests of the United States are at stake save the interests in efficient functioning of the courts and justice for the litigation. The parties' trial date is July 13, 1987. Gildemeister's counsel has stated to the Court that it anticipates no difficulties in producing satisfactory answers to all interrogatories. The Court concludes, therefore, that if there is a reasonable likelihood that the Convention will produce the documentary information sought by S & S, then plaintiff's need to secure information necessary to the vindication of its claim can be accommodated without any unnecessary infringement of the sovereign interests of

---

any certain rule; that no nation will suffer the laws of another to interfere with her own to the injury of her citizens; that whether they do or not must depend on the condition of the country in which the foreign law is sought to be enforced, the particular nature of her legislation, her policy, and the character of her institutions. . . .

J. Story, *Commentaries on the Conflict of Laws* § 28, at 28–29 (8th ed. 1883) (quoting *Saul v. His Creditors,* 5 Mart. (n.s.) 569, 596 (La.1827)), quoted in *Hilton,* 159 U.S. at 165, 16 S.Ct. at 144.

**31.** The five factors (paraphrased) are:

(a) vital national interests of each of the states;

(2) the extent and the nature of hardship that might result to affected parties;

(c) the extent to which conduct takes place in the foreign state;

(d) the nationality of the person; and

(e) the extent to which either state may be able to enforce compliance with its rules.

Restatement (Second) of Foreign Relations Law of the United States § 40 (1965).

the Federal Republic. The question becomes, then, is production likely?

Although West Germany has exercised its option to refuse requests for pretrial production of documents pursuant to Convention article 23, there is a reasonable prospect that this situation will change before this case comes to trial. When the Federal Republic ratified the Convention in 1979, the implementing act also provided:

> However, to the extent that the fundamental principles of the German Law of Procedure are not violated, such requests may be granted considering the justified interests of the persons involved, after the requirements for the granting of such requests and the applicable procedure have been implemented by Regulations which the Minister of Justice with the consent of the Bundesrat (Upper House of Parliament) may issue.

Act to Implement the Hague Evidence Convention in the Federal Republic of Germany, § 14, Bundesgesetzblatt December 22, 1977 I 3106, translated in Brief for the Federal Republic of Germany as Amicus Curiae, *In re Societe Nationale* (No. 85–1695), App. A at 12a (hereinafter FRG amicus brief); *see also* similar translation in II B. Ristau, *International Judicial Assistance* CI–84 (1984).

In the *Societe Nationale* amicus brief, filed Aug. 22, 1986, the West German government states that it recently has "accelerated the procedure" for issuance of regulations that will permit pretrial production of documents "when they are clearly identified, relevant and do not unnecessarily divulge business secrets." The West German government further reported that, in response to "suggestions made by the Government of the United States on the diplomatic level," it is "endeavoring to issue the regulations *before the end of 1986,* after the necessary consent of the Bundesrat ... has been obtained." FRG amicus brief at 9–10 (emphasis added).

■ The Court concludes, that, given (1) the generally cooperative attitude displayed by the West German authorities,[32] (2) the imminent possibility of new regulations that will permit production of documents, and (3) the cooperation that the Court expects from Gildemeister, the likelihood that S & S's resort the Convention will produce results[33] roughly equivalent to those likely pursuant to rules 33 and 34 is substantial. The Court expects defendant Gildemeister will fully cooperate in expediting Convention procedures, having waived effectively any assertion of substantive objections to the instant discovery in this Court. Gildemeister's counsel was given a full opportunity in its briefing and at oral argument to articulate any substantive objections; none were voiced. Because Gildemeister represented to this Court that the only interest to be served by seeking resort to the Convention was protection of the judicial sovereignty of West Germany, it would be grossly unfair to plaintiff and a deception on this Court for Gildemeister to attempt to invoke some substantive privilege after resort to the Convention. The Court will consider any

---

**32.** Between 1980 and 1985, 154 of 181 Letters of Request sent by U.S. Courts to West Germany were accepted and executed. The remaining 27 were rejected because "the evidence to be taken was not sufficiently identified or the request was for the production of documents for pre-trial discovery." FRG amicus brief at 8–9. *See also* Platto, *Taking of Evidence Abroad for Use in Civil Cases in the United States,* 16 Int'l Law 575 (1982) (describing generally satisfactory experience with German authorities under Convention procedures).

**33.** It is reasonable to expect that West German authorities will process the Letter of Request expeditiously. Convention article 9 provides that letters "shall be executed expeditiously." The Convention further specifies that:

> In every instance where the Letter is not executed in whole or in part, the requesting authority shall be informed *immediately* through the same channel and advised of the reasons.

Convention article 13 (emphasis added).

The average delay in executing Letters of Request in all countries signatory to the Convention has ranged between one and six months "depending on such factors as the possible presence of counsel, the courts' workload and the possibility of appeal against the decision on the execution of the request." 1985 Report on the Hague Convention at 1674.

actions by Gildemeister that serve the cause of obstruction or delay during processing of the Convention request by West German authorities as subject to the permissible range of sanctions pursuant to rule 37. *See Societe Internationale Pour Participations Industrielles v. Rogers,* 357 U.S. at 212–13, 78 S.Ct. at 1095–96.

██ Finally, the Court reminds Gildemeister that this ruling requires only a *first* resort to the Convention by S & S; Gildemeister remains subject to the full range of discovery permitted by the Federal Rules of Civil Procedure should resort to the Convention prove futile.

### 3. *First Resort as a Duty Unless Futile*

Having held that a particularized comity analysis of the circumstances of this case requires first resort to the Convention, it is not necessary for this Court to attempt to formulate a more general approach to the problem of transnational discovery. Indeed, the Supreme Court may enunciate a more general guide in its disposition of *Societe Nationale, supra.*

This Court observes, however, that international civil litigants might benefit from the formulation of standards more reproducible in their application than the necessarily fact-laden comity inquiry. The volume of international litigation has grown dramatically in recent years as the world economy has grown more interconnected. As the reporters for the revised Restatement of Foreign Relations Law have noted, moreover:

> No aspect of the extension of the American legal system beyond the territorial frontier of the United States has given rise to so much friction as the request for documents associated with investigation and litigation in the United States.

Restatement (Revised) of Foreign Relations Law of the United States § 437, Reporters' Note 1 (Tentative Draft No. 7, April 10, 1986) (approved May 14, 1986).

Both the Convention and the federal rules would be given effect by an approach that requires litigants seeking foreign discovery to resort to Convention procedures unless their use appeared futile from the outset. *See* Oxman, *supra,* at 761, 782; *Cf. Gebr. Eickhoff Maschinenfabrik and Eisengieberei v. Starcher,* 328 S.E.2d at 506 (resort to Convention required "until such attempt has proven fruitless"). This approach would recognize both the policy of international cooperation and comity embodied in the Convention and the policy of full disclosure embodied in the federal rules. A first-resort approach, furthermore, would leave undisturbed judicial power over parties subject to *in personam* jurisdiction, yet temper the liberality of discovery with the court's inherent supervisory power under rule 26(c). *See Seattle Times Co. v. Rhinehart,* 467 U.S. 20, 30, 104 S.Ct. 2199, 2206, 81 L.Ed.2d 17, 28 (1984).

The proposed approach would provide greater predictability to the litigants, thus manifesting a "greater sensitivity to the need of the international commercial system for predictability in the resolution of disputes." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.,* 473 U.S. 614, ——, 105 S.Ct. 3346, 3355, 87 L.Ed.2d 444, 457 (1985).

A party seeking foreign discovery would know from the outset whether Convention procedures likely would be required and could plan accordingly. If a particular request raised the question of possible futility, resolution of that issue could proceed utilizing familiar allocations of the burdens of production and persuasion.[34]

---

**34.** The requesting party, thus, would be required to make a prima facie showing that the particular request would not be honored in meaningful fashion. The burden then would shift to the requested foreign party to show a substantial likelihood of successful use of Convention procedures. Placing the burden of persuasion on the requested party would follow the established approach of allocating the burden to a party who possesses "readier access to knowledge about the fact in question." F. James & G. Hazard, *Civil Procedure,* § 7.8 at 252 (2d ed. 1977); see Cleary, *Presuming and Pleading: An Essay on Juristic Immaturity,* 12 Stan.L.Rev. 5

### IV. *Conclusion*

For the reasons stated above, the Court denies Gildemeister's motion to dismiss and, with the conditions stated, grants its *motion for a protective order.* S & S shall conform its rule 33 and 34 interrogatories and requests to the Hague Evidence Convention procedures and submit the proposed Letter of Request to this Court for approval. Upon tentative approval of the Letter by the Court, Gildemeister will be given 10 days within which to file any procedural objections or suggestions for expediting the request. The Court draws the attention of S & S to the model Letter of Request set forth by the 1985 Report on the Hague Evidence Convention at 24 Int'l Legal Materials 1681 (1985).

An appropriate Order shall issue.

### APPENDIX A

#### I. (DEFINITIONS and INSTRUCTIONS omitted)

#### II. INTERROGATORIES

1. Describe in detail all modifications made by defendant Gildemeister to its CNC machine known as the GD–200 after the initial production model GD–200 and with respect to each such modification explain the reason(s) why the modification was made; describe the effect the modification had on the installation, operation, maintenance, service, repair or performance of the GD–200 model; state the date of the modification; and state whether or not the particular GD–200 machines purchased by plaintiff incorporated the modification.

2. Describe in detail all changes or modifications made by defendant Gildemeister to the operating, maintenance or repair instructions provided by defendant Gildemeister relating to its CNC machine known as the GD–200 after the initial instructions prepared for the GD–200 model and with respect to each such change or modification explain the reason(s) why the change or modification was made; describe the effect

the change or modification had on the installation, operation, maintenance, service, repair or performance of the GD–200 model; state the date the change or modification was communicated by defendant Gildemeister to persons who sold, purchased, installed, operated, maintained, serviced or repaired GD–200 CNC machines.

3. Describe in detail all modifications made by defendant Gildemeister to its CNC machine known as the MD–5S after the initial production model MD–5S and with respect to each such modification explain the reason(s) why the modification was made; describe the effect the modification had on the installation, operation, maintenance, service, repair or performance of the MD–5S model; and state whether or not the particular MD–5S machine purchased by plaintiff incorporated the modification.

4. Describe in detail all changes or modifications made by defendant Gildemeister to the operating, maintenance or repair instructions provided by defendant Gildemeister relating to its CNC machine known as the MD–5S after the initial instructions prepared for the MD–5S model and with respect to each such change or modification explain the reason(s) why the change or modification was made; describe the effect the change or modification had on the installation, operation, maintenance, service, repair or performance of the MD–5S model; state the date the change or modification was made; and describe the manner in which the change or modification was communicated by defendant Gildemeister to persons who sold, purchased, installed, operated, maintained, serviced or repaired MD–5S CNC machines.

5. State the environment, installation, maintenance and operation requirements as well as the performance standards for defendant Gildemeister's CNC machine models GD–200 and the MD–5S. Include in the response to this question as to each machine: (i) the intended uses (as to function) for the machine and any limitations on the

(1959). It seems fair to presume that the foreign party would have greater information

about (and possibly influence on) its government's attitude toward U.S. discovery requests.

use of the machine; (ii) the recommended and maximum output capacity and number of hours per day usage for the machine; (iii) regular and routine maintenance requirements; and (iv) the expected useful life of the machine.

6. Describe the history of the development and sales of the GD–200 and MD–5S model CNC machines, including the date design began on each model; the dates of testing done on prototypes; the types of testing performed; the results of such testing; the date of the first commercial sale of each model in Europe; a general description of the numbers of each model sold (by month or quarter) in Europe from the date of the first sale through the present; the date of the first commercial sale in North America; and a general description of the numbers of each model sold (by month or quarter) in North America from the date of the first sale through the present.

7. Identify each oral or written communication known to defendant Gildemeister concerning plaintiff's purchase of any of its GD–200 or MD–5S CNC machines that took place prior to the installation of the machine which was the subject of the communication.

8. Identify each person known by defendant Gildemeister to have performed any installation, maintenance, service or repair work on any of plaintiff's GD–200 or MD–5S CNC machines (whether or not such work was performed on behalf of defendant Gildemeister) and, with respect to each such person who performed such work on behalf of defendant Gildemeister, describe in as much detail as possible the training provided such person, including the date, duration and location of each training session, the nature of the training and the identity of the person providing instruction.

9. Describe in as much detail as possible, each and every service call known to defendant Gildemeister to have been made by any person with respect to any of plaintiff's GD–200 or MD–5S CNC machines.

Each such description should identify all written or oral communications known to defendant Gildemeister that relate to the service call and should also include, but should not necessarily be limited to, a statement of the date and nature of any complaint necessitating the service call; the date and length of the service call; the particular machines serviced; the machine failure or other problems observed upon arriving at the plaintiff's place of business; the work performed during the service call; the parts replaced or repaired; any conclusion or opinion (whether such conclusion or opinion was provisional, final, modified or later rejected and including defendant Gildemeister's present conclusion or opinion) concerning the cause of the machine failure or other problems; and any instructions given to the plaintiff concerning the failure or other problems.

10. Describe in as much detail as possible, each complaint known to defendant Gildemeister made by any person (whether or not the complaint was made to defendant Gildemeister), concerning any GD–200 or MD–5S CNC machine. With respect to each complaint: identify the person making the complaint; identify the person to whom the complaint was made; state the nature of the complaint; and state the action taken to respond to the complaint.

11. Identify all oral or written communications between defendant Gildemeister and plaintiff occurring after delivery of the MD–5S CNC machine concerning the quality of the machine delivered to plaintiff or the differences (or lack of differences) between the machine delivered and the machine demonstrated to plaintiff in Chicago.

12. Identify each written or oral communication known to defendant Gildemeister, in which any person either discussed or gave plaintiff instructions concerning the environment, installation, operation, maintenance, service or repair of plaintiff's GD–200 or MD–5S CNC machines.

13. Identify all written or oral communications between defendant Gildemeister

and any person (including defendant Cosa) other than plaintiff relating to either plaintiff's GD–200 or MD–5S CNC machines or the problems with those machines being reported by plaintiff.

14. Describe in as much detail as possible all differences known to defendant Gildemeister between the particular MD–5S machine demonstrated to plaintiff in Chicago and the particular MD–5S machine actually delivered to plaintiff.

15. Describe all warranties and disclaimers of warranties (including any terms excluding liability for consequential damages) that are considered by defendant Gildemeister to have been a part of, or collateral to, any contract between defendant Gildemeister and either defendant Cosa or plaintiff relating to plaintiff's GD–200 or MD–5S CNC machines. With respect to each such warranty or disclaimer described, identify all documents evidencing (i) the substance of such warranty or disclaimer or (ii) the inclusion of such warranty or disclaimer in any contract with plaintiff.

16. State all facts on which defendant Gildemeister bases its affirmative defense that plaintiff is barred from recovery by applicable statutes of limitation and state which statutes of limitations defendant Gildemeister considers applicable to this action.

17. Identify all persons who have been consulted or retained by or on behalf of defendant Gildemeister to formulate or render an opinion concerning the subject matter of this litigation whether or not defendant Gildemeister anticipates that such persons will be called upon to testify at trial and, with respect to those persons who defendant Gildemeister expects to call as an expert witness at trial, state the substance of the facts and opinions to which the expert is expected to testify and a summary of the grounds for each opinion.

18. Identify by case style, court, docket number and citation to reported (if any) opinion all lawsuits whether presently pending, dismissed with or without prejudice, or reduced to judgment known to de-

fendant Gildemeister (whether or not defendant Gildemeister is a party) in which any party sought or seeks to rescind a purchase of either a GD–200 or MD–5S machine or to recover damages based on alleged inadequate installation, maintenance, service, repair, operation or performance of a GD–200 or MD–5S CNC machine whether or not defendant Gildemeister sold, installed, maintained, serviced, repaired or operated the machine involved.

19. Describe in detail the legal and business relationship between defendant Cosa and defendant Gildemeister from the inception of the first such relationship through the present and, if that relationship has changed from time to time during that period, state the date of each such change, explain the reason for the change and describe the relationship both before and after the change. Include in the answer to this interrogatory a description of the mechanism by which defendant Cosa made payment to defendant Gildemeister and the conditions (if any) required to be satisfied before the payment is considered final as well as a description of any formal or informal arrangements between defendant Cosa and defendant Gildemeister concerning the responsibility of each for service and repairs under the terms of any warranty.

20. State the costs to defendant Gildemeister of each of plaintiff's GD–200 and MD–5S CNC machines exclusive of the costs of warranty work done with respect to each machine and state the actual warranty costs associated with each machine.

21. Identify each component part of plaintiff's GD–200 and MD–5S CNC machines that cannot be replaced (without modifications to plaintiff's machines) by replacement parts for the current model GD–200 and MD–5S CNC machines, and with respect to each such component part identified, describe the methods through which replacement parts may be obtained (if such parts are available at all) including the person selling such parts, the mechanism for ordering the parts, the approximate time required to deliver the requested

parts, the cost of the replacement part, and the cost of a similar replacement part for the current model GD–200 and MD–5S CNC machines.

## III. REQUESTS FOR PRODUCTION OF DOCUMENTS

1. All documents relating to or reflecting any legal or business relationship between defendant Cosa and defendant Gildemeister at all times through the present and all documents relating to or reflecting any actual or proposed modifications or changes in any such relationship.

2. All nonidentical copies of the installation, maintenance, operation, service and repair manuals or instructions relating to the GD–200 and MD–5S CNC machines.

3. All documents relating to testing or evaluations of the GD–200 or MD–5S model CNC machines, whether such testing or evaluation was done by defendant Cosa, defendant Gildemeister or any other person.

4. All written communications between defendant Gildemeister and defendant Cosa concerning the installation, operation, maintenance, service, repair or performance of any GD–200 or MD–5S model CNC machines.

5. All documents reflecting the existence or substance of oral communications between defendant Gildemeister and defendant Cosa concerning the installation, operation, maintenance, service, repair or performance of the GD–200 or MD–5S model CNC machines.

6. All documents constituting, or reflecting the existence or substance of, communications between defendant Gildemeister and defendant Cosa relating to plaintiff or the particular GD–200 or MD–5S CNC machines purchased by plaintiff.

7. All documents constituting, or reflecting the existence or substance of, written or oral complaints about the construction, installation, operation, maintenance, service, repair or performance of either a GD–200 or MD–5S model CNC machine.

8. All service reports or other documents reflecting the date of, the work done during, or discussion of any service call by employees or other representatives of either defendant Cosa or defendant Gildemeister to plaintiff's place of business with respect to either of the GD–200 or the MD–5S machines purchased by plaintiff.

9. All service reports or other documents reflecting any service calls made by defendant Gildemeister to examine or repair any GD–200 or MD–5S model CNC machine owned or operated by any person other than plaintiff.

10. Copies of the complaint, answer, pretrial order, pretrial brief of any party, and/or opinion, in any case known to defendant Cosa in which any party sought or seeks to rescind a purchase of a GD–200 or MD–5S CNC machine, or to recover damages based on alleged inadequate installation, maintenance, service, repair, operation or performance of a GD–200 or MD–5S machine, whether or not defendant Gildemeister sold, installed, maintained, serviced, repaired or operated the machine involved.

11. All documents comprising, evidencing or relating to any contract between defendant Gildemeister and either defendant Cosa or plaintiff concerning the sale, service, or supply of parts for either of the GD–200 or the MD–5S machines purchased by plaintiff.

12. Copies of the most recent audited financial statements of defendant Gildemeister.

13. Documents evidencing the sales (whether such sales were made by defendant Gildemeister or any other person) of any GD–200 or MD–5S machine to customers in the United States or Canada. The documents requested include those that would reflect the date of any such sale, the type and quantity of machines sold, the identity of the customer purchasing the machine.

14. All documents constituting or evidencing the existence of any evaluations, whether formal or informal, of the construction, performance, operation, or maintenance of either GD–200 or MD–5S machines.

15. All documents constituting or evidencing either the existence or substance of any written or oral communication concerning the purchase by plaintiff of either of the two GD–200 or the MD–5S CNC machines purchased by plaintiff.

16. All documents constituting or evidencing either the existence or substance of any written or oral communication known to defendant Gildemeister in which any person either discussed or gave plaintiff instructions concerning the environment, installation, operation, maintenance, service or repair of either of the two GD–200 or the MD–5S CNC machines purchased by plaintiff.

17. Copies of all insurance policies with respect to which defendant Gildemeister, or any person on its behalf, has notified the carrier of the existence of this lawsuit, or with respect to which defendant Gildemeister is entitled to make a claim in the event plaintiff prevails in this lawsuit.