IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
September 7, 2004 Session

## PROGENY MARKETING v. FARMERS & MERCHANTS BANK

**Appeal from the Chancery Court for Williamson County**
**No. 29602     Donald P. Harris, Chancellor**

---

**No. M2003-02011-COA-R3-CV - Filed April 7, 2005**

---

This case involves a dispute regarding whether Tennessee courts have personal jurisdiction over a Georgia bank regarding a contract for business services provided by a Tennessee business. The trial court found no personal jurisdiction over the Georgia bank and dismissed Plaintiff's Complaint for lack of personal jurisdiction. We find that the Tennessee Long Arm Statute does give Tennessee courts personal jurisdiction over the Georgia bank; therefore, we reverse this case and remand it for further proceedings.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Reversed**

WILLIAM B. CAIN, J., delivered the opinion of the court, in which WILLIAM C. KOCH, JR., P.J., M.S., and PATRICIA J. COTTRELL, J., joined.

Alexandra Coulter Cross, Anne-Marie Moyes, Nashville, Tennessee, attorneys for the appellant, Progeny Marketing Innovations, Inc.

P. Edward Schell, Franklin, Tennessee, attorney for the appellee, Farmers & Merchants Bank of Eatonton, Georgia.

**OPINION**

I.

Plaintiff, Progeny Marketing Innovation, Inc., ("Progeny") is a Delaware corporation with its principal place of business in Franklin, Tennessee. Defendant, Farmers and Merchants Bank of Eatonton, Georgia, ("Bank") is a financial institution headquartered in Georgia, with no offices in Tennessee. The Bank hired Progeny to create, market and administer a package of services to its customers in Georgia. These services included such things as insurance, discounts, travel benefits, and credit card protection services and were offered to bank customers for a fee based on the level of services requested and the minimum monthly balance in their account.

The parties signed a contract for Progeny's services on June 26, 1992 to run through April 1, 2001. Later, an additional five-year contract was signed to run from April 1, 2001 to April 1, 2006 (collectively, the "Contract"). In March of 2003, the Bank decided to terminate Progeny's services and sent a letter to Progeny stating that its services would terminate effective July 1, 2003. At that time, there was still three years remaining on the Contract.

Progeny filed suit on this Contract in the state of Tennessee requesting declaratory judgment and injunctive relief. The Bank filed a Motion to Dismiss for Lack of Personal Jurisdiction, which was granted by the chancery court. Progeny then filed a Motion to Alter or Amend, which was denied by the chancery court. This appeal by Progeny ensued.

This appeal involves a review of the trial court's grant of the Bank's Motion to Dismiss for Lack of Personal Jurisdiction. In reviewing the trial court's decision to grant the Motion to Dismiss, we take Plaintiff's allegations of fact as true and review the decision of the lower court *de novo* with no presumption of correctness to determine if Plaintiff presented a *prima facie* case for personal jurisdiction. Tenn. R. App. P. 13(d); *Bell v. Icard, Merrill, Cullis, Timm, Furen and Ginsburg, P.A.*, 986 S.W.2d 550, 554 (Tenn. 1999); *United Agric. Servs., Inc. v. Scherer*, 17 S.W.3d 252, 255 (Tenn.Ct.App. 1999); *Chase Cavett Servs., Inc. v. Brandon Apparel Group, Inc.*, No. 02A01-9803-CH-00055, 1998 WL 846708, at *1 (Tenn.Ct.App. Dec. 7, 1998).

> The plaintiff in an action bears the burden of establishing a *prima facie* case that exercising personal jurisdiction over the defendant is proper. *Davis Kidd Booksellers, Inc. v. Day-Impex, Ltd.,* 832 S.W.2d 572, 577 (Tenn.Ct.App. 1992); *accord CompuServe, Inc. v. Patterson*, 89 F.3d 1257, 1261-62 (6th Cir.1996); *Market/Medica Research, Inc. v. Union-Tribune Publ'g Co.*, 951 F.2d 102, 104 (6th Cir. 1991), *cert. denied*, 506 U.S. 824, 113 S.Ct. 79, 121 L.Ed.2d 43 (1992); *Theunissen v. Matthews*, 935 F.2d 1454, 1458 (6th Cir.1991); *Serras v. First Tennessee Bank Nat'l Ass'n*, 875 F.2d 1212, 1214 (6th Cir.1989). If the defendant challenges the trial court's personal jurisdiction over him by filing a properly supported motion to dismiss, "the plaintiff may not stand on his pleadings but must, by affidavit or otherwise, set forth specific facts showing that the court has jurisdiction." *Theunissen*, 935 F.2d at 1458; *accord Serras*, 875 F.2d at 1214.
>
> In ruling on the defendant's motion to dismiss for lack of personal jurisdiction, however, the trial court is required to construe the pleadings and affidavits in the light most favorable to the plaintiff. *Chase Cavett Servs., Inc. v. Brandon Apparel Group, Inc.*, No. 02A01-9803-CH-00055, 1998 WL 846708, at *1 (Tenn.Ct.App. Dec. 7, 1998) (*no perm. app. filed*); *accord CompuServe*, 89 F.3d at 1262; *Market/Media Research*, 951 F.2d at 104; *Theunissen*, 935 F.2d at 1459; *Serras*, 874 F.2d at 1214. Under this standard, dismissal is proper only if all of the specific facts alleged by the plaintiff collectively fail to state a *prima facie* case for jurisdiction. *CompuServe*, 89 F.3d at 1262; *Market/Media Research*, 951 F.2d at 105; *Theunissen*, 935 F.2d at 1459.

*Mfrs. Consolidation Serv., Inc. v. Rodell*, 42 S.W.3d 846, 854-55 (Tenn.Ct.App. 2000).

The sole issue on appeal is whether the chancellor erred in granting Brandon's motion to dismiss Chase's claim for lack of personal jurisdiction. When considering a motion to dismiss, the trial court will give a liberal construction to the plaintiff's complaint and will assume that the averments contained in the complaint are true. *See Lewis v. Allen*, 698 S.W.2d 58,59 (Tenn.1985); *Holloway v. Putnam County*, 534 S.W.2d 292, 296 (Tenn.1976). The trial court is not required to make findings of fact but must only determine whether the plaintiff's complaint has alleged facts sufficient to survive the motion to dismiss. *See S & S Screw Mach. Co. v. Cosa Corp.*, 647 F.Supp. 600, 605 (M.D.Tenn.1986). Because the issue presented on appeal is a question of law, our review of the chancellor's ruling is *de novo* with no presumption of correctness. *See Lucius v. City of Memphis*, 925 S.W.2d 522, 524 (Tenn.1996); T.R.A.P. 13(d).

*Brandon Apparel*, 1998 WL 846708 , at *1.

II.

The Bank filed two affidavits in support of its Motion to Dismiss. One was the affidavit of Joseph P. Hudson, a bank officer and director. In this affidavit, he stated:

During my years of service with the bank, we have done business with a customer service company formerly known as FISI Madison and presently known as Progeny Marketing Innovations, Inc. The bank's marketing representative, Patricia Gibson, has worked primarily with this company, but from time to time I have also talked with various company representatives about particular services that our customers were receiving or not receiving satisfactorily. The customers that should be served are located primarily in Eatonton and other areas in the State of Georgia.

All written contracts were signed in our bank here in Eatonton, Georgia. Progeny Marketing Innovations, Inc. promised to provide the following services/benefits for our bank's customers:

(1)     Provide discount booklets to customers for such things including but not limited to restaurants, motels, etc.;
(2)     Provide eye wear discounts;
(3)     Provide $100,000.00 or $150,000.00 in Common Carrier Accidental Death Insurance;
(4)     Provide $10,000.00 24-hour Accidental Death Insurance;
(5)     Provide credit card registration;
(6)     Provide key ring registration;
(7)     Provide discount prescription plan;
(8)     Provide medical emergency data card;

-3-

(9)     Register child's photo and description with ID Network Safety Service; and

(10)    Receive monthly cards noting important dates to remember.


The second affidavit was from Patricia Gibson, a bank employee who handled marketing, advertising and public relations.  This affidavit stated as follows:

> We have contracted with the services of FISI Madison, now Progeny Marketing Innovations, Inc. since 1992.  To my knowledge all documents were signed here at the Farmers and Merchants Bank in Eatonton, Georgia and all services were to be for our customers in Georgia.
>
> I personally dealt with the Progeny representative.  These meetings were at our offices here in Eatonton, Georgia.  The contracts were signed at our offices here in Eatonton, Georgia.  The services promised by Progeny were to be performed here in Georgia.

In response to the Bank's Motion to Dismiss, Progeny filed the affidavit of Michael Perna, vice president of sales for Progeny.  In this affidavit, Mr. Perna stated:

> 2.     The Tiered Senior Package Services Agreement dated June 26, 1992 (the "Agreement") between Progeny and Farmers & Merchants Bank of Eatonton, Georgia (the "Bank"), and the April 25, 1995 and January 19, 1998 amendment to the Agreement, state that it is binding upon the parties "when executed by an authorized officer of FISI-Madison in Nashville, Tennessee."  The November 30, 1999 and the April 1, 2001 amendments to the Agreement state that such amendments are binding upon the parties "when executed by an authorized officer of FISI-Madison in Brentwood, Tennessee."  A copy of the Agreement, as amended, is attached to the Verified Complaint as **Exhibit A.**
>
> 3.     It is my practice, and the practice of other Progeny officers, to review and approve or reject, at Progeny's executive offices, proposed contracts submitted by Progeny's account executives.  Prior to the current location of Progeny's executive offices in Franklin, Tennessee, Progeny's executive offices were located in Nashville, Tennessee and Brentwood, Tennessee.  The Progeny sales staff who visit client financial institutions such as the Bank lack the authority to bind Progeny to a contract such as the one at issue.  As the Agreement and the amendments state, the review, approval and acceptance of the contract by Progeny's officers is performed at Progeny's offices in Tennessee.
>
> 4.     The Bank has had a business relationship with Progeny since 1992.  During the past 11 years, the Bank has regularly transacted business with Progeny.  Under the Agreement, as amended, Progeny has provided a package of services (the "Program")

to the Bank's depositors. The Program, which includes accidental death insurance; shopping, entertainment, and pharmacy discounts; credit card protection services; and other benefits and services, is administered by Progeny at its principal executive offices in Franklin, Tennessee.

5.     The Program maintained by the Bank has two levels of benefits. The Bank purchases from Progeny, and provides to certain customers on a complimentary basis, the basic level of Program benefits. Customers who want to purchase a higher level of benefits authorize the Bank to deduct a monthly fee from their accounts. The Bank remits payments to Progeny with respect to both levels of benefits by completing a form (prepared by Progeny at its offices in Franklin, Tennessee and mailed to the Bank) and mailing the form and a check to Progeny in Franklin, Tennessee on a monthly basis.

6.     In the course of its relationship with Progeny, the Bank has regularly (1) remitted monthly payments to Progeny's offices in Tennessee; and (2) submitted enrollment documentation to Progeny's offices in Tennessee for Program members on an as-needed basis.

7.     The Program's benefits and services are administered by Progeny at its offices in Tennessee. The materials necessary for Program members to take advantage of the credit card protection service, discounts on shopping and entertainment and accidental death insurance benefits of the Program are provided to members from Progeny's offices in Tennessee. For certain of the Program benefits, members must contact Progeny's offices in Tennessee to utilize the benefits. Whenever the Bank has questions about customer benefits or the operation of the Program, or if it needs additional Program materials such as brochures, it contacts Progeny's employees in Franklin, Tennessee to resolve those issues.

Also in the record were the Contract and amendments signed since 1992 setting out the specific services to be provided by Progeny to the Bank and its customers. The Contract signed in 1992 provided:

> In consideration of a license fee of $2,080 paid by [Bank] to [Progeny], and the mutual obligations set forth in this Agreement, the parties agree to the following:
>
> A.     [Progeny] shall provide and supply to [Bank] and/or its members, as appropriate, the following benefits, services, and materials:
>
>> 1.     Planning and strategy meeting, assistance in pricing, and an Implementation Manual for the Program.

2. Training of FI's employees in establishing and maintaining the Program.

3. Standard wording to describe member benefits and an initial supply of standard Program brochures . . . . ongoing supply of brochures . . . .

4. Direct mail strategy and components . . . .

5. Sufficient fulfillment materials of standard design for all new members of the Program.

6. Standard marketing promotional materials (including newspaper and radio advertising, tent cards, employee badges, brochure take-one stands and inserts) for promoting the Program.

7. The following benefits for each Tier I Program member:

   a. $100,000 Accidental Death Insurance coverage . . . .

   b. [Progeny's] Nationwide Discount Book produced annually.

   c. Credit card protection service.

   d. Key ring and registration service.

   e. At least two issues annually of a financial newsletter, delivered in bulk for [Bank] to distribute to its members.

   f. Emergency Cash Advance Service - A 24 Hour nationwide cash advance service using Visa or MasterCard for a nominal fee.

   g. Travel benefits entitling the member to a 5% cash bonus on scheduled airline travel, room accommodations at hotels/motels in the U.S., and on car rentals.

8. The following benefits for each Tier II Program member:

a. All benefits included in items 7.b. through 7.g. above.

b. $10,000 Accidental Death Insurance, 24-hour blanket coverage on all member accounts. Accidental Death Insurance increases to $150,000 while traveling as a passenger on a common carrier as defined in the insurance certificate. Insurance coverage on member does not reduce at any age.

c. EyeCare Benefits – A program making discounts on eyewear available to all members.

d. Pharmacy Benefits – A mail-order discount program, making discounts on prescription medicine and vitamins available to all members.

9. a. Maintenance of individual Tier II member records necessary to originate transactions.

b. Collection of monthly membership dues for the Program benefits from Tier II member accounts through the ACH.

c. Payment of ACH transaction fees for debits originated by [Progeny].

. . . .

B. [Bank] agrees to:

. . . .

2. Promptly forward to [Progeny] all enrollment and waiver forms for members electing Tier II.

3. Report to [Progeny] by the firth day of each month, on forms supplied by [Progeny], the number of new Tier I members, terminations, and resulting total Tier I members.

4.      Pay to [Progeny], with the monthly report, the following fees:

a. For every month of membership, the following member fee for each applicable plan:

Tier I - $1.00 per member account
Tier II Employee account - $1.00 per member account

If, after the twelfth monthly report, [Progeny's] total monthly membership revenue from the Program is less than $500.00, [Bank] shall pay to [Progeny] the sum of $500.00 per month until total monthly membership revenue exceeds $500.00.

b. A one time set-up charge of $1.50 per new Tier I or Employee Tier II member account enrolled during the month.

Several amendments to the Contract were executed over the years changing slightly the services provided to the members and the fees paid by the members, but the substance of the services and the work performed by Progeny remained substantially the same. The Contract for the program was renewed on April 1, 2001 for an additional 5 years.

After reviewing the information submitted by the parties, the trial court granted the Bank's Motion for Summary Judgment stating:

This case is before the court upon a motion to dismiss for lack of personal jurisdiction filed by the defendant, Farmers & Merchants Bank of Eatonton, Georgia. In the opinion of the court, the defendant does not have sufficient contacts with the State of Tennessee such that this suit could be maintained consistently with fair play and substantial justice. The plaintiff recruited the defendant in the State of Georgia to use plaintiff's services for the benefit of the defendant's depositors. Payments for those services were mailed to plaintiff's offices in Tennessee. Enrollment information was periodically forwarded to plaintiff's Tennessee offices. Based on these contacts, the plaintiff now seeks to have a Tennessee court control the way a Georgia bank deals with its Georgia customers concerning the services plaintiff provides. In the opinion of the court, such an action cannot be maintained consistently with due process. The defendant's motion to dismiss should be granted.

III.

It has long been recognized that state courts have an interest in resolving contract disputes between a citizen of this state and citizens of other states. *See McGee v. Int'l. Life Ins. Co.*, 355 U.S. 220 (1957); *William W. Bond, Jr. & Assocs., Inc. v. Montego Bay Dev. Corp.*, 405 F.Supp. 256 (W.D.Tenn. 1975). In the case of *Bond & Assocs.*, Plaintiff was Tennessee corporation hired by a

-8-

Maryland corporation to prepare architectural, mechanical, electrical, and structural plans for a hotel in Maryland. A breach of contract action regarding this contract ensued. Although, at that time, Tennessee's Long Arm Statute was less expansive than the one in force today, the district court found enough minimum contacts with Tennessee as a result of this contract that subjecting the defendant to personal jurisdiction in the state of Tennessee met with due process requirements. In making this determination and analyzing the specific contacts of the defendant in that case, the district court stated:

> The defendants initially solicited the services of plaintiff in the preparation of plans and specifications for a project out of state. It was necessarily foreseeable to the parties that at least a substantial part of the services plaintiff was to provide would be performed at its offices in Tennessee. That no representative of the defendants was ever physically in Tennessee is not a controlling consideration. *Mohasco*, supra at 382. As stated in *Mohasco*, supra, at 382-383: ' . . . business is transacted in a state when obligations created by the defendant or business operations set in motion by the defendant have a realistic impact on the commerce of the state; and the defendant has purposefully availed himself of the opportunity of acting there if he should have reasonably foreseen that the transaction would have consequences in that state.' Here, a business transaction set in motion by defendants had a realistic, foreseeable and considerable impact on commerce in Tennessee. Thus the first criterion of *Mohasco* is met, that defendants have purposefully availed themselves of the privilege of acting or causing a consequence in the forum state.

> Under the *Mohasco* standard, it is clear also that the cause of action arose from defendants' activities in Tennessee. 'Only when the operative facts of the controversy are not related to the defendant's contact with the state can it be said that the cause of action does not arise from that contract.' *Mohasco*, supra at 384, fn. 29.

> The third criterion of *Mohasco* is that the contacts with the forum state be substantial enough so as to make it reasonable to require the defendants to defend the suit here. The interest of Tennessee here is to resolve a contract dispute brought by a resident to recover the alleged benefit of his bargain. Even a one-shot contract, if substantial enough in its effect on Tennessee commerce, appears to be a potentially sufficient contact with the forum state under Sixth Circuit standards.

*Bond & Assocs.*, 405 F.Supp. at 259-60.

In a case even more on point, the Supreme Court of Tennessee determined, in *Nicholstone Book Bindery, Inc. v. Chelsea House Publishers*, 621 S.W.2d 560 (Tenn.1981), that a publisher whose only contact with the state of Tennessee was to send a book to a Tennessee book binder for printing and binding was subject to personal jurisdiction in the state of Tennessee for a dispute regarding that contract. Said the court:

[T]he physical presence of the defendant or its agent in the forum state is "not necessary" for the transaction of business to serve as a minimum contact. *See also Good Hope Industries v. Ryder Scott Co.*, Mass., 389 N.E.2d 76 (1979). Nor is it material that defendant did not solicit the business or that the contract was executed in the foreign state. 401 F.2d at 382. Similarly, the determination of which party initiated the business transaction is irrelevant. . . . The crucial factor is that the subsequent conduct of the defendant shows that it purposefully availed itself of the privilege of carrying on activities to secure goods from a manufacturer and seller located within the forum. Likewise, technicalities of the execution of the contract cannot change the business realities of the transaction.

[T]he significant point is that defendant did choose to do business with plaintiff, and it cannot diminish the purposefulness of that choice that defendant was fortunate enough to take advantage of plaintiff's low bid, even if accomplished without active solicitation. 401 F.2d at 382. It is clear, therefore, that the business transaction was beneficial to both parties, and that though plaintiff placed bids for the work and sent a salesman to discuss details with defendant in New York, the transaction began as a result of a purchase order having been sent by defendant to plaintiff in Tennessee.

*Nicholstone Book Bindery*, 621 S.W.2d at 563.

Later, in 1981, it was determined that, as a result of a change in the Tennessee Long Arm Statute from a 'single act' statute to a 'minimum contacts' statute, the specific test laid out in *Southern Machine Co. v. Mahasco Industries, Inc.*, 401 F.2d 374 (6th Cir. 1968), used by the courts to determine personal jurisdiction in both *Nicholstone Book Bindery* and *Bond & Assocs.*, was no longer the correct test to be applied in Tennessee. However, the Tennessee courts provided for an even more expansive test as a result of this change in the Tennessee Long Arm Statute. In the case of *Shelby Mutual Ins. Co. v. Moore*, 645 S.W.2d 242 (Tenn.Ct.App.1981), this Court expanded the long arm jurisdiction of the state of Tennessee.

As noted previously, with addition of subsection (f), the Tennessee long arm statute was changed from a 'single act' statute to a 'minimum contacts' statute. Thus, while the *Mohasco* test is properly applicable to a single act statute, it is too narrow and restrictive for the present Tennessee long arm statute.

The test for determining the outer limits of *in personam* jurisdiction under a 'minimum contacts' statute is somewhat more amorphous than the *Mohasco* test. The amount and kind of activities which must be carried on by the foreign corporation in the forum state so as to make it reasonable and just to subject the corporation to the jurisdiction of that state should be determined according to the particular facts in each case. *Perkins v. Benguet Consolidated Mining Co., supra.* See also *Velandra v. Regie Nationale des Usines Renault*, 336 F.2d 292 (6th Cir.1964), *supra.* The test is one of 'general fairness to the corporation,' *Perkins v.*

-10-

*Benguet, supra*, 342 U.S. at 445, 72 S.Ct. 413 at 418, and this must of necessity involve some subjective value judgment by the courts.

Nonetheless, it is possible to define certain elements which are to be considered in determining whether or not the requisite 'minimum contacts' are present in a given case. The following remarks by Judge Blackmun (now Mr. Justice Blackmun) are of assistance in this respect:

> '... at one time or another in the opinions, three primary factors, namely, the quantity of the contacts, the nature and quality of the contacts, and the source and connection of the cause of action with those contacts, are stressed and ... two others, interest of the forum state and convenience, receive mention.... The Supreme Court has certainly not indicated that all five of these factors must be present in substantial degree for jurisdiction to be constitutionally effected.'
> *Aftanase v. Economy Baler Co.*, 343 F.2d 187, 197 (8ᵗʰ Cir.1965).

See also *Odom v. Thomas*, 338 F.Supp. 877 (S.D.Tex.1971), similarly citing these criteria for the minimum contacts test."

417 F.Supp. At 493-95.

We agree with the foregoing interpretation of the effect of the addition of subsection (6) to our Long Arm Statute and the analysis of the District Court of the test for determining the outer limits of *in personam* jurisdiction under a "minimum contacts" statute.

*Moore*, 645 S.W.2d at 246.

In *Masada Investment Corp. v. Allen*, 697 S.W.2d 332 (Tenn. 1985), the Tennessee Supreme Court agreed with the Court of Appeals' five part test for long-arm jurisdiction set out in *Moore*. Said the court:

> In determining whether or not a state can assert long-arm jurisdiction, due process requires that a non-resident defendant be subjected to a judgment *in personam* only if he has minimum contacts with the forum such that "the maintenance of the suit does not offend 'traditonal notions of fair play and substantial justice.;' " *International Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945). However, the absence of physical contacts will not defeat *in personam* jurisdiction where a commercial actor purposefully directs his activities toward citizens of the forum State and litigation results from injuries arising out of or relating to those activities. *Burger King Corp. v. Rudzeqicz*, [471] U.S. [462], 105 S.Ct. 2174, 2182, 85 L.Ed.2d 528 (1985). In such a case, "the defendant's conduct

and connection with the forum State are such that he should reasonable anticipate being haled into court there." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297, 100 S.Ct. 559, 567, 62 L.Ed.2d 490 (1980).

The *Moore* court noted that three primary factors are to be considered in determining whether the requisite minimum contacts were present: the quantity of the contacts, their nature and quality, and the source and connection of the cause of action with those contacts. Two lesser factors to be considered are the interest of the forum State and convenience.

*Masada*, 697 S.W.2d at 334; *See also J.I. Case Corp. v. Williams*, 832 S.W.2d 530 (Tenn.1992).

This Court further discussed and expounded on this five-part test in *United Agricultural Svcs. v. Scherer*, 17 S.W.3d 252 (Tenn.Ct.App.1999), *perm. app. denied* (Tenn.2000). In applying the five part test from *Moore*, this Court determined that Tennessee's long-arm jurisdiction allowed for a Michigan resident and corporation to be sued in the state of Tennessee. The plaintiff, United Agricultural Services, was contacted by a mortgage company to provide an environmental site assessment for land to be purchased by a Michigan corporation. The property was located in Michigan. The plaintiff traveled to Michigan to inspect the property and then returned to Tennessee where the analysis and preparation of the report was done. This report was ultimately used by the Michigan corporation to obtain its loan. As a result of their report, the plaintiff was also hired to perform clean-up operations on the property in Michigan. When the loan closed, the plaintiff was not paid for its services. Scherer, president of the Michigan corporation, provided the plaintiff with a promissory note which he personally guaranteed. Plaintiff then filed suit against the defendant on this promissory note. In finding personal jurisdiction over the defendant, the court stated:

The proof in this case is that Ag Services and Michigan Apple, acting through Scherer, made an arrangement whereby Ag Services would perform a service in connection with the environmental requirements necessary for a loan that Scherer's corporation was trying to obtain. The work contracted for required visits to Michigan but more importantly Ag Services did the field work in Michigan then returned to its office in Memphis to perform necessary analyses, compilations, interpretations, and other work in order to prepare and submit the necessary reports. It is undisputed that this work was all done in the Memphis office. . . .

Admittedly, in the instant case the contract was between the foreign corporation and Ag Services, but the defendant, Scherer, was part and parcel of the negotiations and activities leading to the contract. Scherer acted as agent for the corporation and his action created a consequence in Tennessee. Although Scherer could not be subjected to this jurisdiction for his activity in negotiating the contract as agent, the corporation would meet the minimum contacts test.

However, there is a more compelling reason for establishing personal jurisdiction over Scherer. Michigan Apple's note paid for the services under the contract and was guaranteed by the defendant Scherer. The note specifically provided for payment in the State of Tennessee. Thus, Scherer guaranteed the payment of sums to be paid in Tennessee by virtue of the note. This comes within the provisions of T.C.A. § 20-2-223(a)(2) as a contract to supply "things" in this state.

The claim for relief by Ag Services arises from the default in the payment of this note. *See* T.C.A. § 20-2-223(b). The note was prepared in Tennessee, is governed by Tennessee law by the terms thereof, and payments were to be made in Tennessee. We believe this satisfies the requirement of T.C.A. § 20-2-223.

*Scherer*, 17 S.W.3d at 258-59.

IV.

Although the Contract in the case at bar was transported to Georgia by employees of Progeny and primarily executed in the state of Georgia, it was drawn up in Tennessee, was signed by Progeny employees in Tennessee, and was to be construed under Tennessee laws. We find the execution of the Contract in Georgia and the fact that no representative of the Bank was ever physically present in the state of Tennessee not to be controlling. Further, that the services contracted for and provided by Progeny were ultimately administered to citizens of Georgia is equally not decisive. These parties had an eleven-year relationship as a result of the Contract at issue. Also as a result of this Contract, Progeny was required to do a significant amount of work in Tennessee at its Tennessee offices. This work included contacting third parties to obtain their participation in the program, creating and distributing materials regarding the services offered to Bank customers, marketing those services, and administering those services from their Tennessee offices to the residents of Georgia. The fact that these products and services were sent to and used by residents of another state does not lessen the impact of the contract in the state of Tennessee. Further, all payments and enrollment documents were submitted to Progeny's offices in Tennessee, and materials for members were provided from the Tennessee office. In addition, Progeny had direct contact with program members from Tennessee and provided some customer service from its office in Tennessee.

In examining the quantity of the contacts, the nature and quality of the contacts, and the source and connection of the cause of action with the contacts, we believe that the requisite minimum contacts are present to give Tennessee long arm jurisdiction over the Bank. The 11-year relationship of the parties, as well as the extensive amount of work performed by Progeny in the state of Tennessee, certainly provide the minimum contacts necessary to allow *in personam* jurisdiction in the state of Tennessee such that maintenance of the suit will not offend traditional notions of fair play and substantial justice. *Masada*, 697 S.W.2d at 334, citing *Int. Shoe Corp. v. Washington* 326 U.S. 310, 316 (1945). Even though Progeny initially pursued the Bank in Georgia as a client, for over 11 years the Bank purposefully directed the work required by the Contract toward the citizens

of Tennessee, and this litigation results from that Contract with Progeny, a corporation with its principle place of business in Tennessee. The Bank chose to do business with Progeny, *Nicholstone Book Bindery*, 621 S.W.2d at 563, caused work to be done in Tennessee, and created a continuing contractual obligation with Progeny in Tennessee. *Scherer*, 17 S.W.3d at 259. Also, in looking at the interest of Tennessee and the convenience to the parties, we find that Tennessee has an interest in resolving contract disputes between its residents and residents of other states. *Bond & Assocs.*, 405 F.Supp. at 260. Further, pursuant to the Contract, this matter will be decided under Tennessee law, and the primary issue of whether Plaintiff properly performed the Contract will require access to information from Progeny's offices in Tennessee and its employees, also in Tennessee. Thus, Tennessee would be the most convenient forum for the parties.

In addition, as in *Scherer*, we believe this Contract also comes under Tennessee Code Annotated section 20-2-223(a)(2), being a contract to supply 'things'.

> (a) A court may exercise personal jurisdiction over a person, who acts directly or indirectly, as to a claim for relief arising from the person's:
>
> (1) Transacting any business in this state;
>
> (2) Contracting to supply services or things in this state; . . .
>
> (b) When jurisdiction of a person is based solely upon this section, only a claim for relief arising from acts enumerated in this section may be asserted against that person.

Tenn.Code Ann. § 20-2-223 (Supp. 2004).

*Scherer*, involved only a note owed by a non-resident, prepared in Tennessee, governed by Tennessee law, with payments to be made in Tennessee. *Scherer*, 17 S.W.3d at 259. The business relationship under the Contract at issue is much more extensive. In addition to the Contract being prepared in Tennessee, being governed by Tennessee law, and requiring payment in Tennessee, the Contract caused extensive work to be done in Tennessee. Contracts with third party providers had to be negotiated from Tennessee. Marketing and product information and materials were created in Tennessee. In fact, the entire program was created in and administered from Tennessee. Based on *Scherer*, this Contract certainly comes within section 20-2-223(a)(2) of the Code and provides the court with jurisdiction over the parties for this Contract dispute.

Progeny also initially appealed the trial court's decision to deny its Motion to Alter or Amend. However, this matter was neither briefed by Progeny nor argued before this Court; therefore, this issue is waived. Tenn.R.App.P 13(b).

The decision of the trial court is reversed, and the case is remanded for further proceedings.

Costs of appeal are assessed against Appellee.

_____

WILLIAM B. CAIN, JUDGE